_____ )
EDWARD G. WRIGHT,                  )
                                   )
          Plaintiff,               )
                                   )
                                   )
      v.                           )      CIVIL ACTION NO. 98-10507-PBS
                                   )
JOHN MARSHALL,                     )
                                   )
          Defendants.              )
_____ )

## MEMORANDUM AND ORDER

July 17, 2008

Saris, U.S.D.J.

## INTRODUCTION

On April 10, 1985, petitioner Edward G. Wright was convicted
by a jury in Massachusetts state court of the murder of Penny
Anderson.  He was sentenced to life without parole.  The
petitioner seeks a writ of habeas corpus on a number of grounds,
some of which the Court previously denied on the merits (See
Docket No. 41), while the rest are barred by procedural default.

Petitioner now seeks to revive his procedurally defaulted
claims, arguing that he has newly available evidence of his
actual innocence.  Petitioner relies upon the testimony of Maria
Rivera Ramos, who testified that in 1985, during a post-trial
altercation with her then-boyfriend Allen Smalls, Smalls told her
"I'm going to kill you just like I killed Penny."  The government
vigorously opposes any renewal of petitioner's procedurally

defaulted claims.

After a review of the submissions and an evidentiary
hearing, the petitioner's motion for reconsideration (Docket No.
43) is **ALLOWED**.

**FACTUAL BACKGROUND**

For purposes of this motion the court reviews the evidence
available at the trial of the petitioner, held in Hampden County
Superior Court in April 1985, as well as the "actual innocence"
evidence submitted.

**I.    Evidence at Trial**[1]

    A.    Undisputed Facts

The following facts were largely undisputed. On May 13,
1984, petitioner Edward G. Wright borrowed a Pontiac Grand Prix
from a friend, Vernal Archie, and drove to Club 418, a nightclub
in Springfield, Massachusetts. There he "talked" with the
victim, Penny Anderson, who worked at the Club as a dancer. (Tr.
6:71, 75-76).

Later that night, the petitioner and the victim left the
Club and went to the victim's apartment located at 306 Dwight
Street Extension in Springfield. Petitioner then left the
apartment, although the parties dispute when. Still later that
night, petitioner went to the home of Archie and slept in the

_____

[1] All references to the evidence presented at trial are to
the trial transcript. ("Tr.," cited by volume number and page
number).

borrowed car.  The next morning, Archie and his girlfriend drove
the petitioner to the home of the petitioner's sister, Mary
Wright, in New Castle, Delaware.

Later that day, at approximately 3:30 P.M., officers from
the Springfield Police Department discovered the body of the
victim lying on her apartment floor.  The victim was covered in
blood, and blood covered the area around her.  Two days later, on
May 16, 1984, police arrested the petitioner at his sister's home
in Delaware.  Petitioner gave a statement to the police admitting
that, on the night of May 13th-14th, he had sexual intercourse
with the victim, and that he left at 1:00 a.m. when the victim
was asleep.  Petitioner finished his statement by saying Penny
was a "whore" on "tic."[2]  (Tr. 3:121).  An autopsy was performed
on the victim by Hampden County Medical Examiner, Loren J.
Mednick, who concluded that the victim died of loss of blood from
multiple stab wounds.  Dr. Mednick determined the time of death
of the victim to be May 14th, between approximately 12:15 A.M.
and 6:15 A.M.

B.   Occult Blood

The government introduced evidence of occult blood located
in the Pontiac Grand Prix, found during a search of the car by
police sometime after Archie's return from Delaware.  The blood
was not connected to the petitioner or to the victim, and no

---

[2] "Tic" is street vernacular for drugs.

testing was done as to blood type, whether the blood was human or animal blood, or how long the blood was present in the car. A week earlier, on May 7, 1984, petitioner was stabbed in the back and arm, among other injuries, and Archie drove the petitioner to the hospital in the car. During the trip, petitioner did not wear a shirt.

C. The Nike Sneakers

The government also introduced a footwear impression found on two floor tiles that were removed from the victim's apartment. The impression had a checkerboard pattern, and included blood. The blood on the tile was not tested as to blood type, whether the blood was human or animal blood, or the length of time on the tile.

Mark Grant, a chemist for the Massachusetts Department of Public Safety, obtained the impression on May 23, 1984, and compared the impression to a pair of Nike sneakers seized from the petitioner following his arrest. Grant testified that the tread patterns on the sneakers and the checkerboard pattern on the impressions were "similar," consisting of 6mm x 6mm squares. (Tr. 4:55-56). However, the Nike sneakers were a common shoe, and Grant did not take note of the spaces between the squares on the imprints.

No blood was found on Wright's Nike sneakers. Grant opined that during the nine days between the murder and the seizure of the sneakers there was a "strong possibility the blood would wear

away." (Tr. 4:46-47). An officer for the Springfield police,
however, testified that the sneakers were seized on or around May
17, 1985, the day after the petitioner's arrest.

D. <u>Testimony of Neighbors</u>

One of the victim's neighbor, Brenda Fisher, testified that
she saw the victim and a male, who she identified as the
petitioner, returning to the victim's apartment at approximately
12:45 A.M. on May 14, 1984. Another neighbor, Al Liquori,
testified that he was awoken that night at approximately 4:00
A.M. by a woman screaming "please, don't do it," and for someone
to call the police. (Tr. 4:26-27). He looked out the window and
noticed that the victim's light was on and her window was open.
Liquori heard a car leave the scene after the screaming stopped.

E. <u>Statement and Testimony of Arthur Turner</u>

On May 16, 1984, two days after the murder, Arthur Turner,
the son of Thelma Turner Moss, the petitioner's girlfriend at the
time, gave a statement to the police (the "Statement"). (<u>See</u> Tr.
5:148, 161; App.[3] at 143-49). As background, Turner and Wright
had a complicated relationship, even hostile at times, in part

---

[3] References to "App.," the "Suppl. App.," and the "Second
Suppl. App." are to (1) the Appendix to Petitioner's Motion for
an Evidentiary Hearing [Consisting of the Appendix to the
Defendant's Motion for New Trial] ("App.," Docket No. 77); (2)
the Supplemental Appendix to Petitioner's Motion for an
Evidentiary Hearing ("Suppl. App.," Docket No. 78); and (3) the
Supplemental Appendix in Support of Petitioner's Submission RE:
Impact of Evidence of Actual Innocence ("Second Suppl. App.,"
Docket No. 99).

because Wright was younger than Turner.  Moreover, Wright and
Moss had a tumultuous relationship, with Moss obtaining a
restraining order against Wright.  On the Friday prior to the
murder, Arthur Turner had brought petitioner money so that he
could leave town on May 13th and return to Delaware.  Wright
decided against going to Delaware that day.

In his Statement, Turner told the police that he had known
"Ed Wright" for about three and one half years.  (App. at 147).
Turner then stated:

> At about 4:30 p.m. Monday, May 14, 1984, I
> received a phone call from Ed.  He told me he
> had done something wrong.  I asked him
> "What?"  He said, "I killed someone you know
> her because she's on TIC."  He then told me
> she lived on Dwight St. Ext. and that she was
> a white bitch.
> He said that he had made love to her and
> he was lying on the bed with a knife strapped
> to his leg.  She told him she had a gun and
> pulled it out and fired at him.  He jumped up
> and grabbed her wrist and stabbed her and
> because she didn't turn the gun loose, he had
> to do what he had to do.  He said he never
> thought he would have to kill the bitch.  He
> went on to say he knew she was dead because
> he had a knife with a 14" blade.  He also
> said no one would find it.  He said he bought
> the knife at the pawn shop in the south end.
> He said after he did this he had to
> catch the 3:05 out of Springfield, in the
> morning.
> He said if you don't believe me, keep
> watching the news or go get the paper and
> then I would know who she was.

(App. at 148-49).  On December 12, 1984 Turner gave a statement
to an attorney, witnessed by his mother, recanting assertion in
the Statement that the caller was the petitioner.  (See Tr.

5:161-62) (text of statement).  There was evidence that at the
time of the recantation, Turner's mother was visiting Wright at
the jail.  (<u>See</u> <u>id.</u> 5:17 (voir dire); 160).  Regardless, the
Statement was later read to the grand jury and affirmed true to
the grand jury by Turner.  (<u>See</u> App. 147-49).

At trial, Turner affirmed the phone call described in the
Statement, but recanted his identification of the petitioner as
the caller.  Turner further testified that he received two phone
calls on the afternoon of May 14th.  The first was from the
petitioner's sister, Mary Wright, that lasted "quite a while."
(Tr. 5:23 (voir dire), 173-74).  The second was the phone call
from "Ed," and lasted less than ten minutes.  (Tr. 5:25, 174).
Earlier that day, prior to receiving the phone calls, Turner was
in a serious car accident.

At voir dire, Turner testified about the circumstances that
led to the Statement.  Turner testified that he told his sister
about the call, who later told Turner's brother, who, in turn,
asked Turner if he could relay the call to the police.  Turner
told his brother that it was up to him.  Turner later received a
phone call from the police at his workplace.  The police informed
Turner that the petitioner committed the murder, and Turner,
accordingly, only read most (although not all) of the Statement
before signing it, since he "didn't see any reason to go any
further with it."  (Tr. 5:33-34).

F.    <u>The Phone Records and Testimony of Mary Wright</u>

The government also introduced into evidence a phone record of three long distance phone calls made from the Mary Wright's home in Delaware on May 14, 1984.  The record showed that the following three calls were made that afternoon:

```
4:16 P.M.        413-737-6218, lasting 4 minutes
4:41 P.M.        413-788-4299, lasting 36 minutes
5:18 P.M.        413-737-0011, lasting 2 minutes
```

(Tr. 4:5-6).  The second number, 413-788-4299, belonged to Arthur Turner.

Mary Wright testified for the defense, and stated that she made all three phone calls.  She further testified that neither she nor her boyfriend witnessed the petitioner make a phone call on May 14th.

G.  <u>Testimony of Esther Slater</u>

Esther Slater, the aunt of Arthur Turner and the sister of Thelma Turner Moss, testified for the government that her phone number is 413-737-6218, the first number listed on the phone record, and further testified that she received a phone call from the petitioner on May 14th.  According to Slater, the petitioner told her that he was in Delaware to visit his sick father, and that he made it there without a problem.  Slater also testified that the petitioner asked her for the phone numbers of his girlfriend, Thelma Turner Moss, Arthur Turner, and Arthur's sister, Carol Turner.  Slater did not mention her phone call with the petitioner when police first spoke with her a year earlier.  Moreover, the police spoke with Slater the night before her

testimony.

H.   Testimony of Wright

The petitioner Wright took the stand and testified as
follows.  He had known Penny Anderson since 1982, and saw her
frequently at clubs.  On the night of the murder, at about 10:00
P.M., he went to Club 418 where he talked with Penny.  They got
into Wright's friend Archie's car for a few minutes.  Just before
the victim got out of the car, she saw Allen Smalls, and went
into Club 418 with Smalls.  Petitioner left to go get gas, and,
upon returning to the Club, noticed that Smalls was still there.
Wright and Anderson decided to leave to pick up her infant.  As
they were going out the door, Allen Smalls grabbed her and her
pocketbook fell.  Smalls and Anderson had words "in a loud tone
of voice."  (Tr. 6:83).  Smalls followed her out to the car where
the angry encounter continued.  Wright and the victim
subsequently left together.  After picking up her eight-month old
child from her mother's house, the petitioner and the victim
drove to her apartment and, upon arriving, had sex in the back of
the car.  They then went up to the apartment and, after some
beers, he left between 1:00 to 1:30 A.M.  He then went to his
friend Vernal Archie's house, but slept in the car.  The next day
petitioner went with Archie and his girlfriend to visit Wright's
sister in Delaware.  He was arrested on May 16.

II.  **Actual Innocence Evidence**

A.    <u>Allen Smalls</u>

As just mentioned, the petitioner testified at trial that, prior to leaving Club 418 with the victim on the night of May 13th-14th, he witnessed a loud exchange between the victim and Allen Smalls, a former boyfriend of the victim.  (Tr. 6:83). Moreover, in a statement to police dated May 14, 1984, a dancer at the 418 Club, Donna Palozie, witnessed "Penny . . . screaming and pointing her finger at Smalls" that night.  (Second Suppl. App. at 3).

Smalls testified before the grand jury concerning the murder, but did not testify at trial.  At the grand jury hearing a statement that Small gave to the police shortly after the murder was read.  In the statement Smalls stated that he was at Club 418 on the night of May 13th and that he had an exchange with the victim.  In particular, Smalls stated that he witnessed the victim with "a black guy" he later identified for police. (App. at 139, 141-42).  He then stated the following:

> I said to [the victim], "Where are you
> going?"  She said, "I'm going to pick up my
> baby."  "And then I'm going home to fuck
> him."  I said to her, "Don't go home because
> I'll be there when you get there."  She said,
> "You ain't my man no more" and then they [the
> victim and the "black guy"] left.

(<u>Id.</u> at 140).  Smalls then stated that he went home "[a] short time later" on his moped, getting a ticket for a "moving violation" along the way.  (<u>Id.</u>).

B.    <u>Lee Britt and the Motion(s) for New Trial</u>

After conviction, the petitioner, under new counsel, filed a Motion for a New Trial in state court based on newly discovered evidence. Petitioner offered in support of his motion the affidavit of Lee Britt, the mother of Allen Smalls, dated January 13, 1986. (See App. at 68). In her affidavit, Britt stated that, shortly after the murder, she was informed by her daughter that Smalls "was trying to sell a large hunting Knife encased in leather." (Id. at 68, ¶ 2). She also stated that Smalls arrived home late the night of the murder, that her husband "Bradford is sure the time was 3:30a.m. and that was the early morning of May 14, 1984." (Id. at 69, ¶ 4). Significantly, Britt further stated that she saw Smalls with property from the victim's apartment following the murder, with Smalls telling her that he broke into the victim's apartment. (Id. at 69, ¶ 8). Britt also observed that Smalls was "extremely anxious to have Edward Wright apprehended" and that his behavior "bec[ame] erratic and bizarre." (Id. at 69, ¶¶ 6-7).

Britt then stated the following:

> I went to Florida in April 1985 after
> attending the Trial of Edward Wright, where
> as I went to visit Allen and his girl Friend.
> Allens girlfriend Maria Rivera admitted to me
> that last year in 1984, , After Penny was
> Murdered, Allen threatened to Kill her, and
> that his words to her was " I will Kill You
> Just Like I Did Penny ", Maria also said she
> thought he was only trying to scare her so
> she disregarded it, Then she said Allen also
> admitted that " He HAD NEVER TOLD ANYONE
> BEFORE, ONLY HER " and Maria said he never
> mentioned it again.

(App. at 70, ¶ 9). Britt stated that she asked Smalls during
another phone conversation if he had told Maria that he had
killed Penny Anderson, and Allen admitted he had told her this,
but further stated that he only said it out of anger to scare her
and denied killing Penny. (Id.).

At the evidentiary hearing on the motion for a new trial,
held on October 7, 1986, Britt testified as to the contents of
her affidavit. Britt, in particular, disputed Smalls' contention
in his statement that he came home shortly after leaving the Club
418 on his moped, although she relied upon what her husband
reported to her. Her daughter, Cynthia Harris, also testified
that Smalls asked her boyfriend if he wanted to purchase a
hunting knife. The knife was purchased by Donna Harris, Cynthia
Harris's sister, and was submitted as evidence. (App. at 112 (as
Exhibit B)). Britt also testified that she sat through the trial
of the petitioner because she was a friend of Penny Anderson and
her mother, but did not tell anyone that her son had Penny's
belongings the day after the murder or any other information
until after the trial.

The state court denied the petitioner's motion for a new
trial, finding that "[v]irtually all of the testimony was
hearsay, with the exception of the observation of [Smalls's]
alleged bizarre behavior." (App. at 132). The court also found
the testimony of Cynthia Harris "inconsequential and of dubious

probative value." (Id. at 133). The state court also found that "[a] comparison of the pattern of the sole of the sneaker with the marks that were found in the victim's apartment with bloodstains shows that there was no similarity between Mr. Smalls' alleged sneaker and that of the marks found in the apartment at the time of the murder." (Id.) (emphasis added).

Petitioner then filed a second motion for a new trial, pro se, on July 7, 1987, which was denied, and appealed both denials. The Supreme Judicial Court upheld the denials. See generally Commonwealth v. Wright, 411 Mass. 678 (1992). Petitioner also moved for a new trial a third time and was denied without a hearing. Leave to appeal the third denial pursuant to M.G.L. c.278, § 33E was also denied.

In between the second and third motions for new trial, petitioner filed a petition for habeas corpus in September 1992. See generally Wright v. Pepe, Civ. A. No. 92-12301 (Tauro, J.). However, the petitioner voluntarily moved to dismiss the petition in April 1993 without prejudice to continue to pursue his unexhausted state remedies. Judge Tauro allowed this motion.

C.    The Habeas Petition

After exhausting his state law remedies, the petitioner filed this timely pro se petition for habeas corpus relief. Among other things, petitioner presented a number of constitutional claims that he failed to raised in state court, arguing that the Court was permitted to review these claims

13

because he had evidence of his actual innocence. In support,
petitioner submitted the affidavit of Lee Britt and the evidence
presented at his first motion for a new trial in state court.
After a careful review, this Court found, among other things, the
following:

> In evaluating the evidence presented,
> excluded, and available after trial, this
> Court is not persuaded under this actual
> innocence standard. Petitioner presented new
> evidence that the victim's ex-boyfriend,
> Allan Smalls, had threatened the victim the
> night of the murder at the night club, was
> not at home when the victim was murdered,
> although he testified before the grand jury
> that he was, had tried to sell a knife
> possibly similar to the one used to murder
> the victim, and had allegedly told his new
> girlfriend (after the trial) that he would
> kill her as he had killed the victim. If
> properly corroborated, this information would
> provide troubling new evidence of actual
> innocence. Although he was represented by
> two different appellate counsel who could
> have sought funding, petitioner has not
> presented an affidavit from the girlfriend to
> prove that Smalls actually made the
> inculpatory post-trial statement, or
> conducted forensic testing on the blood of
> the knife.

Wright v. Marshall, Civ. A. No. 98-10507, Memorandum and Order,
at 27 (D. Mass. Sept. 24, 1999) (emphasis added).

    D.    Maria Rivera-Ramos and the Motion for Reconsideration

    On October 21, 1999, the petitioner moved to reconsider the
Court's order on his habeas petition. (See Docket No. 43). In
support of his motion, the petitioner submitted an affidavit and
the transcript of a tape recorded message by Maria Rivera

(married name Ramos) recounting Smalls's out-of-court statement. (See App. at 1-6). A private investigator hired by the petitioner's brother had located Ms. Ramos living with her husband in Tampa, Florida. At that point, the Court allowed petitioner's request to appoint counsel to represent the petitioner.

On March 2, 2001, the Court stayed federal habeas proceedings without prejudice and with consent of the parties to allow the petitioner to seek relief and exhaust his remedies in state court based on the new evidence, and to conduct forensic testing on the hunting knife Britt attributed to Smalls, which was submitted as evidence in the <u>first</u> motion for a new trial in 1986.

Petitioner then submitted the hunting knife to the State Police Crime Laboratory for forensic testing. Although the laboratory detected blood on the knife, the blood extracted from the knife yielded "[i]nsufficient DNA for STR fragment analysis." (See App. at 26). Subsequent analysis showed that the samples taken were contaminated. (See Suppl. App. at 7).

Undaunted, the petitioner proceeded to file in state court a <u>fourth</u> motion for a new trial, relying solely on the affidavit of Ramos, and also claiming that his previous counsel was ineffective in failing to locate Ramos earlier and present admissible evidence of her admission. An evidentiary hearing was

requested. The state court denied the fourth motion without an evidentiary hearing to assess the credibility of Ramos. Leave to appeal to a Single Justice was also denied because the Single Justice concluded that under M.G.L. c.278, § 33E, the petitioner failed to "demonstrate that the evidence is in fact new and that it could not have been discovered with reasonable diligence at the time of his first, second, or third motion for new trial." (Suppl. App. at 81). She rejected the claim of ineffective assistance of appellate counsel because it was not made in the earlier motions and petitioner had not demonstrated that his attorney fell below the requisite level of skill and competence. The Single Justice also found that, even if the evidence could be considered new, it did not present a "substantial" question because (1) it was unclear whether Smalls, who had testified at the grand jury, was "unavailable" to permit the admissibility of his hearsay statement, and (2) it was a close question whether Smalls perceived his statement as against his penal interest. (Id. at 83-85).

After failing to obtain relief in state court, on September 20, 2006, the petitioner returned to federal court and requested an evidentiary hearing on Ms. Ramos's testimony. Over the government's objection, the Court allowed the petitioner's request, and held an evidentiary hearing on October 26, 2007.

E. The Evidentiary Hearing

At the hearing, Ramos testified as follows. She began to

16

date "Greg" (Gregory is Smalls's middle name) in approximately 1981-1982. (Hr'g Tr. at 11). She described Smalls as tall, muscular, and with an "evil streak." (Id. at 17). Smalls had previously dated the victim, and Smalls put up nude pictures of the her in his room in the home of Lee Britt. Smalls called the victim his "first love" and Ramos fought with him over the pictures. (Id. at 16). Smalls used cocaine and drank heavily. He also regularly hit Ramos. Ramos, who never met the victim, stopped dating Smalls before the murder.

Ramos began dating Smalls again after the murder. Several months after the trial of the petitioner, Smalls took Ramos in her Toyota Corolla to a heavily wooded area in Springfield. She then testified:

> So he drove me there. And, uhm, I'm petrified of snakes. So he parked the car one night, and he had been drinking, he was drinking. And he's, like, "Get out of the car," and I says "No. Get out of the car. No."
> So, finally, he just pulls me out of the car and throws me over the back trunk of the car, pulls my hair, and he forced himself on me, but I was fighting it. So he just grabbed my hair like this, got close to my ear, and he just stated, "Stay still, bitch, or <u>I'll kill you just like I killed Penny."</u>
> . . .
> I was just crying and trembling, and I couldn't trust him because I -- oh, oh, well, he did choke my neck. I mean, he was so strong, and I was fighting and fighting. But he did pull my hair all the way back, and it hurt so bad, and he said, you know, "You'd better stay still, I'm going to --" he says, "You bitch, <u>I'm going to kill you just like I killed Penny."</u>

> . . .
> I said to him, "So you're the one that killed
> Penny," and he said, "Yeah, but nobody's
> going to find out."

(Hr'g Tr. at 24-25) (emphasis added).  Although Smalls drank that
night, "[h]e knew what he was saying and doing."  (Id. at 29).
Ramos did not drink that evening.  Smalls then drove out of the
woods.  Because it was "eating me alive," (id. at 27), she soon
relayed Smalls's outburst to Smalls's mother, Lee Britt.  Smalls
told her a few days after his threat: "You know what I told you.
. . . Don't tell nobody because if you tell anybody, I'll know."
(Id. at 39).

Ramos later "got away from" Smalls and moved from
Springfield to Tampa, Florida, in 1986 where she currently
resides with her husband and son.  (Hr'g Tr. at 25).  She only
saw Smalls once since then.  When asked why she did not talk to
law enforcement about Smalls's statement, Ramos testified that
she feared retaliation from Smalls.

At the hearing, Ramos stated she had recently been diagnosed
with bipolar disease and manic depression and was on medication
for this psychiatric condition.  Plaintiff stated she did not
experience any symptoms of bipolar disease in the early 1980s.
Ramos expressed animus towards Smalls, at one point describing
Smalls in her lone recent encounter as "fat, toothless, and
ugly."  (Hr'g Tr. at 35).

**DISCUSSION**

18

## I. Standard for a Gateway Claim

"As a general rule, claims forfeited under state law may support federal habeas relief only if the prisoner demonstrates cause for the default and prejudice from the asserted error." House v. Bell, 547 U.S. 518, 536 (2006) (citing cases).  However, there "is a narrow exception to the cause-and-prejudice imperative, seldom to be used, and explicitly tied to a showing of actual innocence."  Burks v. DuBois, 55 F.3d 712, 717 (1st Cir. 1995) (citing Schlup v. Delo, 513 U.S. 298, 321 (1995)) (emphasis added).

To establish actual innocence, "petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt."  Schlup, 513 U.S. at 327.  The habeas court "must make 'a probabilistic determination about what reasonable, properly instructed jurors would do.'" Id. at 329; see also House, 547 U.S. at 538 (same). In evaluating petitioner's innocence, "Schlup makes plain that the habeas court must consider ''all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.'" House, 547 U.S. at 538 (citing Schlup, 513 U.S. at 327-28).

## II. Evidentiary Hearing

The government protests that an evidentiary hearing was

foreclosed under 28 U.S.C. § 2254(b)(2) because the petitioner
failed to develop the factual basis of his own claim in state
court proceedings when he had the opportunity and does not fall
within any other statutory exception.  <u>See</u> 28 U.S.C. §
2254(e)(2).[4]  Petitioner responds that these statutory provisions
are inapplicable where a petitioner asserts actual innocence as a
gateway to consideration of procedurally defaulted claims.

Petitioner's argument is persuasive because he is not
seeking to develop the factual basis for a habeas claim which he
failed to assert in state court under § 2254(e)(2).  Petitioner's
"gateway" claim does not address the merits of any of his

---

[4] 28 U.S.C. § 2254(e)(2) provides:

> If the applicant has failed to develop the
> factual basis of a claim in State court
> proceedings, the court shall not hold an
> evidentiary hearing on the claim unless the
> applicant shows that --
>
> (A) the claim relies on –
>
> (i) a new rule of constitutional law, made
> retroactive to cases on collateral review by
> the Supreme Court, that was previously
> unavailable; or
>
> (ii) a factual predicate that could not have
> been previously discovered through the
> exercise of due diligence; and
>
> (B) the facts underlying the claim would be
> sufficient to establish by clear and
> convincing evidence that but for
> constitutional error, no reasonable
> factfinder would have found the applicant
> guilty of the underlying offense.

procedurally defaulted claims.  Instead, his claim of "actual

innocence" only goes to whether the Court is permitted to

adjudicate the merits of those claims <u>at all</u>.  Petitioner's claim

therefore only raises the manifest injustice that would result

from the Court declining to hear his procedurally defaulted

claim.  The Supreme Court stated the appropriate standard for

evaluating these gateway claims:

> As an initial matter, the State argues that
> the Antiterrorism and Effective Death Penalty
> Act of 1996 (AEDPA). . . has replaced the
> <u>Schlup</u> standard with a stricter test based on
> <u>Sawyer</u>, which permits consideration of
> successive, abusive, or defaulted sentence-
> related claims only if the petitioner
> "show[s] by clear and convincing evidence
> that, but for a constitutional error, no
> reasonable juror would have found the
> petitioner eligible for the death penalty
> under the applicate state law."  505 U.S. at
> 336, 112 S.Ct. 2515, 120 L. Ed.2d 269.  One
> AEDPA provision establishes a similar
> standard for second or successive petitioners
> involving no retroactively applicable new
> law, 28 U.S.C. §2244(b)(2)(B)(ii); <u>another
> sets it as a threshold for obtaining an
> evidentiary hearing on claims the petitioner
> failed to develop in state court,
> §2254(e)(2).  Neither provision addresses the
> type of petitioner at issue here - a first
> federal habeas petition seeking consideration
> of defaulted claims based on a showing of
> actual innocence.  Thus, the standard of
> review in these provisions is inapplicable.</u>

<u>House</u>, 547 U.S. at 539 (emphasis added).  Thus, 28 U.S.C. §

2254(e)(2) is inapplicable to petitioner's gateway claim of

actual innocence.

**III.  <u>Application</u>**

Petitioner's evidence of "actual innocence" primarily consists of the affidavit and testimony of Maria Rivera Ramos, in particular, her contention that Allan Smalls told her "I'm going to kill you just like I killed Penny."  Petitioner argues that Smalls's statement is evidence of Smalls's culpability for the murder, and would consequently raise reasonable doubt among reasonable jurors as to the culpability of the petitioner.

Respondent vigorously disagrees.  As an initial matter, respondent attacks the credibility of Ramos, arguing that the statement made by Smalls occurred over twenty years ago, that she was medicated during the evidentiary hearing, and that she expressed bias against Smalls.

It is true that Ramos was under medication at the evidentiary hearing for a "bipolar and manic depression."  (Hr'g Tr. at 6).  Ramos also expressed bias against Smalls because of the abusive relationship she had with Smalls.  These factors do impair her credibility.

Despite these factors, the Court finds Ramos's testimony credible.  <u>First</u>, Ramos's statements have been largely consistent over twenty years since she first told Lee Britt.  In fact, the vividness of her description of the night of Smalls' statement, remembering, for example, the car that they traveled in and details of the wooded area they went to, enhances the credibility of her testimony.  Moreover, at the hearing, Ramos did not exhibit any indication that her medication affected her memory of

the statements.  <u>Second</u>, Ramos had no relationship with
Petitioner and had no motive to help him or his family.  While
Ramos clearly hated Smalls, she was also terrified of him, which
explains why she did not initially go to the police.  <u>Finally</u>,
the Court stresses the impact of Ms. Ramos's testimony on the
stand.  Had the petitioner only submitted her statement in
affidavit form, it would be unclear whether it would have been
sufficient to satisfy the actual innocence standard under <u>Schlup</u>.
However, after listening to Ms. Ramos, I find her credible at the
hearing that Smalls's statements were made.

Respondent principally argues that Ramos's testimony as to
Smalls's outburst does not rise to the high level of "reliable
evidence," such as "exculpatory scientific evidence, trustworthy
eyewitness accounts, or critical physical evidence," necessary to
mount an actual innocence claim.  See <u>House</u>, 547 U.S. at 537
(citing <u>Schlup</u>, 513 U.S. at 324).

Respondent relies on <u>House v. Bell</u>, in which the Supreme
Court, for the first time, upheld a gateway claim of actual
innocence.  In <u>House</u> the petitioner was convicted of rape and
murder in Tennessee state court, and sought relief based upon
newly acquired evidence of his actual evidence.  The Court upheld
the gateway claim, relying on three types of evidence presented
by the petitioner.  <u>First</u>, the Court relied on DNA evidence that
showed that blood and semen samples collected from the victim
stemmed from the victim's husband, not the petitioner.  <u>House</u>,

23

547 U.S. at 540.  <u>Second</u>, the <u>House</u> Court credited new evidence of "disarray" in the collection and testing of blood evidence from the scene of the crime; in particular, key evidence that, during testing, a sample of the victim's blood was spilled on a pair of jeans House wore the night of the murder.  <u>Id.</u> at 542-43, 547-48.  <u>Third</u>, the Court credited new eyewitness testimony of two witnesses who testified that the victim's husband confessed to the murder on two separate occasions.  <u>Id.</u> at 549-50.  The Court found that, unlike evidence "vouching for a defendant and incriminating a conveniently absent suspect," "[t]he confession evidence here involves an alleged spontaneous statement recounted by two eyewitnesses with no evident motive to lie."  <u>Id.</u> at 552.  The <u>House</u> Court concluded that although "[t]his is not a case of conclusive exoneration," the Court found sufficient evidence of actual innocence since "the central forensic proof connecting House to the crime—the blood and the semen—has been called into question, <u>and House put forward substantial evidence pointing to a different suspect</u>."  <u>Id.</u> at 553-54 (emphasis added).

The government argues that, unlike the evidence in <u>House</u>, Smalls's outburst was no more than an empty threat, made under the influence of alcohol to scare Ramos, that had no foundation in reality.  The specificity of Smalls's threat, however, undermines any claim that his threat was empty.  Smalls not only threatened Ramos, but told her that night that he, in fact, murdered the victim "but nobody's going to find out."  (Hr'g Tr.

24

at 25).  Moreover, while this confession may have been alcohol induced, Smalls later told Ramos "[d]on't tell nobody" about the outburst.  (Id. at 39).  The Court credits these statements as evidence that Smalls was likely making more than a drunken, empty threat to scare Ramos into submission.

Although Smalls's threat was not empty, respondent is correct to argue that Ramos's testimony does not arise to the quality of evidence in submitted in House.  Unlike in House, petitioner has not submitted "exculpatory scientific evidence" or "critical physical evidence" in support of his gateway claim. The sole candidate for such "critical physical evidence," forensic testing of the knife, proved inconclusive because it was contaminated.  The case was stayed partly to enable the parties to conduct a forensic DNA analysis which was unfortunately unsuccessful in either proving or disproving innocence.

Nevertheless, the Court is required to make a "a holistic judgment about 'all the evidence.'" House, 547 U.S. at 539 (quoting Schlup, 513 U.S. at 328).  Here, petitioner presented, at the least, a "trustworthy eyewitness account," the testimony of Ms. Ramos. Accordingly, the Ramos testimony must be weighed against all the evidence, "old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under the rules of admissibility that would govern at trial."  See id. at 538 (citations and quotations omitted).

The evidence presented at trial against Wright was very

strong, particularly the phone call confession, and supported his conviction. Still, the evidence contained a number of key gaps. First, the physical evidence against the petitioner, such as the blood samples on the car, was never connected to the petitioner, and the sneaker prints were inconclusive. In fact, there was scant physical evidence linking him to the murder. Second, Wright's "confession" was recanted in part at trial when Arthur Turner refused to identify the petitioner as the caller. Admittedly, evidence demonstrated that a call was made from the home of Mary Wright, where the petitioner was staying at the time, and the caller did identify himself as "Ed." However, Turner's flip-flopping gives pause. Third, the other evidence against the petitioner was largely circumstantial. No one identified him as the man leaving the apartment at about 4:00 A.M. after the screams were heard. While the evidence of flight to Delaware certainly helped the government at trial, the undisputed evidence was that the petitioner had planned to travel to Delaware before that weekend.

The tough question is whether the "actual innocence" evidence is sufficient to establish a likelihood that reasonable jurors would have a reasonable doubt as to whether Wright or Smalls was the killer. The Court finds that it is for several reasons. First, and most significantly, Smalls confessed that he committed the murder to Ramos. Second, Smalls had a motive to kill Penny. It is undisputed he exchanged "loud" words with the

26

strong, particularly the phone call confession, and supported his conviction. Still, the evidence contained a number of key gaps. First, the physical evidence against the petitioner, such as the blood samples on the car, was never connected to the petitioner, and the sneaker prints were inconclusive. In fact, there was scant physical evidence linking him to the murder. Second, Wright's "confession" was recanted in part at trial when Arthur Turner refused to identify the petitioner as the caller. Admittedly, evidence demonstrated that a call was made from the home of Mary Wright, where the petitioner was staying at the time, and the caller did identify himself as "Ed." However, Turner's flip-flopping gives pause. Third, the other evidence against the petitioner was largely circumstantial. No one identified him as the man leaving the apartment at about 4:00 A.M. after the screams were heard. While the evidence of flight to Delaware certainly helped the government at trial, the undisputed evidence was that the petitioner had planned to travel to Delaware before that weekend.

The tough question is whether the "actual innocence" evidence is sufficient to establish a likelihood that reasonable jurors would have a reasonable doubt as to whether Wright or Smalls was the killer. The Court finds that it is for several reasons. First, and most significantly, Smalls confessed that he committed the murder to Ramos. Second, Smalls had a motive to kill Penny. It is undisputed he exchanged "loud" words with the

victim at the Club the night of the murder because he was angry she was leaving with petitioner and wanted to sleep with her himself. Another dancer at the bar confirmed that Smalls and Penny were screaming at each other at 11:30 P.M. (Second Supp. App. at 3). There was evidence he was obsessed with Penny, and kept the naked pictures of her. There was also evidence of his erratic behavior shortly after the murder involving a knife. Third, Smalls had the opportunity to commit the crime. Although he told the police he was headed home immediately from the Club on his moped, Britt stated in her affidavit that her husband reported that he did not get home until 3:30 A.M. that morning. While this is hearsay, I am permitted to consider this hearsay statement under House. Finally, Lee Britt testified she saw Smalls with Penny's belongings the day after the murder and admitted breaking into her apartment.

Although the actual innocence standard is "demanding and permits review only in the 'extraordinary' case," it "does not require absolute certainty about the petitioner's guilt or innocence." House, 547 U.S. at 538. In examining the totality of the evidence, the Court finds that the inclusion of Ms. Ramos's testimony makes it "more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." Id. at 537 (citations omitted). This is by no means conclusive exoneration, but this Court is not required or permitted to assess guilt or innocence. Nonetheless, given

the two conflicting plausible theories of who committed the
murder, and evidence concerning the alternative suspect, the
Court concludes that the petitioner has satisfied his burden.

## ORDER

For the reasons stated, petitioner's motion for reconsideration (Docket No. 43) is **ALLOWED**. Petitioner shall submit briefs concerning his procedurally defaulted claims within 60 days. The petitioner is precluded from raising any substantive claim not raised in his previously filed habeas petition.

**S/PATTI B. SARIS**
United States District Judge