UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                              )
EDWARD G. WRIGHT,             )
                Petitioner,   )
                              )
        v.                    )  CIVIL ACTION NO. 98-10507-PBS
                              )
JOHN MARSHALL,                )
                Respondent.   )
_____)
```

**MEMORANDUM AND ORDER**

November 9, 2009

Saris, U.S.D.J.

**INTRODUCTION**

On April 10, 1985, a Massachusetts state court jury convicted petitioner Edward G. Wright of the murder of Penny Anderson, and sentenced him to life in prison without the possibility of parole.  Unable to prevail on three separate motions for a new trial, Wright filed a petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 on March 10, 1998.  On September 24, 1999, this Court denied Wright's petition.  Wright promptly moved for reconsideration on the basis of allegations that another man, Allen Smalls, had admitted to his then-girlfriend Maria Rivera Ramos that he had killed Ms. Anderson.

In March 2001, this Court stayed federal proceedings so that Wright could return to state court to present the exculpatory

evidence.[1]  Concluding that Ms. Rivera Ramos's statement, then in affidavit form, was inadmissible hearsay, the state court denied Wright's fourth motion for a new trial.  Over the Commonwealth's objections, this Court then granted an evidentiary hearing to consider Ms. Rivera Ramos' statement.  She testified before the Court on October 26, 2007, and on the basis of all the evidence, the Court concluded that Wright had met his burden of establishing a gateway actual innocence claim under <u>Schlup v. Delo</u>, 513 U.S. 298, 321 (1995).  On July 17, 2008, this Court therefore allowed Wright's motion for reconsideration, thus reviving procedurally defaulted claims.  <u>Wright v. Marshall</u>, No. 98-10507, 2008 U.S. Dist. LEXIS 54072, at *2 (D. Mass. July 17, 2008).

The Supreme Court has not recognized actual innocence as a ground for federal habeas relief.  <u>See</u> <u>Herrera v. Collins</u>, 506 U.S. 390, 393 (1993).  <u>See also</u> <u>In re Davis</u>, 174 L. Ed. 2d 614, 616 (2009) (Scalia, J., dissenting) (noting that the Court has "repeatedly left that question unresolved" as to whether the Constitution forbids the execution of a convicted defendant who can convince a habeas court that he is factually innocent).  Instead, a colorable claim of actual innocence merely opens the

---

[1] The case was also stayed so that Petitioner could obtain DNA testing of a knife – possibly the murder weapon – that Allen Smalls was allegedly trying to sell.  The DNA tests were inconclusive.

gate to a petitioner's procedurally defaulted claims.  See
Barreto-Barreto v. United States, 551 F.3d 95, 102 (1st Cir.
2008) (quoting Schlup, 513 U.S. at 315).

Petitioner asserts four violations of his right to due
process under the Fourteenth Amendment, and three violations of
the right to effective assistance of counsel guaranteed by the
Sixth Amendment.  The government vigorously denies that Wright's
trial was tainted by any constitutional error.  After a review of
the submissions, Petitioner's motion for reconsideration is
**DENIED**.

**FACTUAL BACKGROUND**

For purposes of this motion, the Court assumes familiarity
with the facts as set forth in the July 17, 2008 opinion.
Wright, 2008 U.S. Dist. LEXIS 54072, at *2-23.  Since Petitioner
focuses his appeal entirely on the issues relating to Arthur
Turner's identification of Petitioner, additional facts specific
to Turner will be laid out within.

**DISCUSSION**

**1. Standard of Review**

As amended by the Antiterrorism and Effective Death Penalty
Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d) provides the standard
of review for claims made in habeas cases that were "adjudicated
on the merits in State court proceedings . . . ."  § 2254(d).
Under that statute, habeas relief may not be granted unless the

state court's adjudication on the merits:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Id. As the introductory language makes clear, this deferential standard only applies "with respect to any claim that was adjudicated on the merits in State court proceedings." Id.

A matter is "adjudicated on the merits" when "there is a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground." Teti v. Bender, 507 F.3d 50, 56 (1st Cir. 2007) (quoting Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001)). In the absence of such a decision, the federal habeas court must review the petitioner's claims de novo. Yeboah-Sefah v. Ficco, 556 F.3d 53, 66 (1st Cir. 2009). See also DiBennedetto v. Hall, 272 F.3d 1, 11 (1st Cir. 2001) ("If the state court has not decided the federal constitutional claim . . . then we cannot say that the constitutional claim was 'adjudicated on the merits' within the meaning of § 2254 and therefore entitled to the deferential review prescribed in subsection (d).").

In this case, as no state court ever considered Petitioner's due process claims on the merits, this Court will review Petitioner's due process claims de novo. The state court did,

however, consider and reject several ineffective assistance of counsel claims. Commonwealth v. Wright, 584 N.E.2d 621, 626 (Mass. 1992). Nevertheless, the previous ineffective assistance of counsel claims are distinct from those at hand: the government concedes that one of Petitioner's old claims merely "touches on" the same factual background as one of his current claims. (Resp't's Mem. 33 n.16.) Since the state courts never directly ruled on Wright's current ineffective assistance of counsel claims, this Court will consider those claims de novo.

In reviewing Petitioner's claims, this Court must only grant relief if any error identified is not harmless. "[I]n § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in Brecht." Fry v. Pliler, 551 U.S. 112, 121 (2007). Therefore, "[o]n collateral review of trial error, the test for harmless error is whether the error had a 'substantial and injurious effect or influence in determining the jury's verdict.'" Foxworth v. St. Amand, 570 F.3d 414, 436 (1st Cir. 2009) (internal citations omitted). As the Supreme Court has said, "in cases of grave doubt as to harmlessness the petitioner must win." O'Neal v. McAninch, 513 U.S. 432, 437 (1995).

   2. **Denial of Due Process of Law**

      A.  **Threats of Perjury**

Petitioner claims that the prosecutor and trial judge subjected Arthur Turner to intimidating instructions and repeated threats of prosecution for perjury in violation of Petitioner's due process right to offer the testimony of witnesses in his own defense. Washington v. Texas, 388 U.S. 14, 19 (1967) (establishing "the right to present [one's] own witnesses to establish a defense" as "a fundamental element of due process of law"). In United States v. Hoffman, the First Circuit held that an action to vindicate this right cannot succeed "unless some contested act or omission (1) can be attributed to the sovereign and (2) causes the loss or erosion of testimony which is both (3) material to the case and (4) favorable to the defendant." 832 F.2d 1299, 1303 (1st Cir. 1987) (requiring a causal nexus between the government (mis)conduct and loss or erosion of witness' testimony). In Petitioner's view, Turner's testimony was "eroded" as a result of pressure to testify in accordance with his grand jury testimony and to retreat from his voir dire testimony.

The voir dire of Arthur Turner was conducted in the middle of Petitioner's trial. After the voir dire, the prosecutor stated to the Court that he would charge Turner with perjury:

> It's my intention regardless of the ruling, I'm going
> to put him on the stand. I do think after his
> testimony, everything else, this man ought to be again
> cautioned as with Judge Keady. We are going to pursue
> a perjury charge.

(Tr. V:45 (emphasis added).) Petitioner characterizes this as a

"direct threat" and alleges that "[t]here can be no doubt that Turner heard this . . . ." (Pet'r's Mem. 13.)

Contrary to Petitioner's assertions, the record indicates that Turner did not overhear the prosecutor's comments. Immediately prior to these comments, the trial court instructed Turner to step down from the witness stand. (Tr. V:45.) The record then indicates a bench conference. (Id.) Throughout the bench conference, the attorneys referred to Turner in the third person. Toward the end of the bench conference, the judge stated, "I suppose I have to further caution him. I don't mind doing that. Maybe we could ask him to come up." (Tr. V:46.) After the judge asked Turner to "step up, please," the record indicates: "Arthur Turner approaches the bench." (Tr. V:47.) While it does appear that Turner was in the courtroom, the assertion that Turner overheard the bench conference where the prosecution stated his intention of pursuing a perjury charge is no more than speculation. See Hoffman, 832 F.2d at 1304 (rejecting claim of prosecutorial intimidation where there was "not a scintilla of proof" that witness ever learned of the intimidating communication).

Petitioner insists that Turner was subjected to an inappropriate barrage of warnings that directly affected the nature of his testimony. The record indicates that at a pre-trial hearing, Judge Keady had cautioned Turner to retain counsel before testifying in Petitioner's trial. (Tr. V:45-46.) The

-7-

trial judge reiterated this advice during Turner's voir dire:

> THE COURT:  I understand that on an earlier occasion Judge Keady spoke to you concerning the wisdom of your having an attorney to represent your interests in this situation?
>
> MR. TURNER: Yes, sir.
>
> THE COURT: Since there is a potential that there may be growing out of this some action in which your rights would be potentially effected and of course you should have the benefit of such advice now rather than then.

(Tr. V:47.)

While Turner might reasonably have understood the reference to "some action in which your rights would be potentially effected" as a possible perjury prosecution, it is difficult to read the advice to retain counsel as creating an "atmosphere of intimidation," as Petitioner alleges.  (Pet'r's Mem. 12.)

Petitioner points to more language from the judge to suggest that Turner had no choice but to tell the story that pleased the government.  After confirming that Turner was not indigent, the trial judge stated: "I therefore will not appoint counsel to represent you.  You should nevertheless consider obtaining counsel.  Since it is imminent that your testimony is going to be taken in this case and there are ramifications, I suggest you make a quick phone call."  (Tr. V:52.)  The effect of these remarks, Petitioner alleges, was that Turner's testimony at trial was far more beneficial to the Commonwealth than his prior testimony on voir dire had been.

This factual claim is only weakly supported by the record.

-8-

As the basis for his claim, Petitioner points to testimony relating to the duration of Turner's conversation with "Ed" and relating to whether that person was "Edward Wright." Telephone records from the date in question indicated only one call from Wright's location in Delaware to Turner's phone number. That call began at 4:41 p.m. and lasted thirty-six minutes. (Tr. V:21.) This phone call is especially significant in light of Turner's statement to the police, introduced through his grand jury testimony, that he had received a phone call from "Ed" at "about 4:30 p.m.". (Tr. V:11.)

During his voir dire, Turner testified that he had received two calls, one from Wright's sister that had lasted "quite a while," and then a call from "Ed" that lasted for "a few minutes." (Tr. V:23, 20.) At trial, Turner's testimony was slightly different. He continued to maintain that his conversation with "Ed" lasted "roughly maybe ten minutes." (Tr. V:155.) When confronted with the telephone record of a conversation from Delaware to Turner lasting thirty-six minutes, Turner stated, "According to the document it states thirty-six minutes." (Id.) Despite acknowledging that the phone record indicated a call from Delaware to Turner that lasted for thirty-six minutes, Turner continued to insist that the conversation with "Ed" lasted "maybe about ten minutes or so, a little less." (Tr. V:174.) Even on the prosecutor's re-direct examination, Turner maintained that he couldn't say whether the person to whom

he spoke for thirty-six minutes was Ed.  (Tr. V:180.)

Nor did Turner's trial testimony about who called him deviate from his testimony during voir dire.  Petitioner notes that at trial, Turner agreed with the prosecutor that he received a phone call from "Edward Wright," and a person "who said he was Ed Wright."  (Tr. V:151, 156.)  During voir dire, however, Turner also agreed with the prosecutor that he received a call from a person who "identified [himself] as Eddie Wright."  (Tr. V:18.) Turner also testified at trial that he "had doubts" that the person who called him was "Ed Wright."  (Tr. V:176.)  When asked if he could confirm whether the person who called him was in fact Ed Wright, Turner responded, "No, sir, I can't say that."  (Tr. V:178.)  The differences between Turner's testimony at voir dire and his testimony at trial do not support the claim that intimidation by the government made his testimony substantially more beneficial to the government.

The law is no more on Petitioner's side than the facts.  In support of his claim, Petitioner relies on the line of cases derived from <u>Webb v. Texas</u>, 409 U.S. 95 (1972).  In <u>Webb</u>, the Court reversed a defendant's conviction where the trial judge cautioned the defendant's only potential witness against committing perjury in such "unnecessarily strong terms" that it may have "exerted such duress on the witness' mind as to preclude him from making a free and voluntary choice whether or not to testify."  <u>Webb</u>, 409 U.S. at 98.  To quote from the trial judge's

warning in that case:

> If you take the witness stand and lie under oath, the
> Court will personally see that your case goes to the
> grand jury and you will be indicted for perjury and the
> liklihood (sic) is that you would get convicted of
> perjury and that it would be stacked onto what you have
> already got, so that is the matter you have got to make
> up your mind on. If you get on the witness stand and
> lie, it is probably going to mean several years and at
> least more time that you are going to have to serve. It
> will also be held against you in the penitentiary when
> you're up for parole and the Court wants you to
> thoroughly understand the chances you're taking by
> getting on that witness stand under oath. You may tell
> the truth and if you do, that is all right, but if you
> lie you can get into real trouble. The court wants you
> to know that. You don't owe anybody anything to testify
> and it must be done freely and voluntarily and with the
> thorough understanding that you know the hazard you are
> taking.

Id. at 96.  Upon hearing that instruction, the witness elected
not to testify.  Id.  Not surprisingly, the Court found that the
trial judge "effectively drove that witness off the stand, and
thus deprived the petitioner of due process of law under the
Fourteenth Amendment."  Id. at 98.

It is immediately obvious that the trial court's warning in
Webb is qualitatively different than the trial court's warning to
Arthur Turner.  At no point did the judge threaten Turner that he
would "personally see to it" that Turner would be indicted for
perjury; at no point did the judge warn Turner that perjury
"would probably mean several years . . . in the penitentiary"; at
no point did the judge tell Turner that he could be in "real
trouble."  By contrast, the judge warned Turner of "a potential"
for "some action in which your rights would be potentially

effected," and suggested obtaining counsel. (Tr. V:47.) As other courts have noted, "<u>Webb</u> does not stand for the proposition that merely warning a defendant of the consequences of perjury demands reversal." <u>United States v. Smith</u>, 997 F.2d 674, 679 (10th Cir. 1993) (quoting <u>United States v. Harlin</u>, 539 F.2d 679, 681 (9th Cir. 1976)). <u>Cf.</u> <u>United States v. Simmons</u>, 670 F.2d 365, 371 (D.C. Cir. 1982) ("It is hardly a threat for a prosecutor to advise a potential witness, who is telling two stories with respect to a defendant's criminal involvement, that he might be prosecuted for perjury if he testifies falsely.").

In a case squarely on point, the First Circuit considered a judge's warning that included reciting federal statutes that the witness might violate if she testified. <u>United States v. Santiago-Becerril</u>, 130 F.3d 11, 23-24 (1st Cir. 1997). Predictably, the witness who heard that warning declined to testify. <u>Id.</u> at 24. Noting that "[a] judge is entitled to make sure a witness understands her Fifth Amendment rights," the First Circuit concluded that there was "no impropriety in the court's conduct, and no duress precluding a free and voluntary choice." <u>Id.</u> at 26. If there was no <u>Webb</u>-based violation in <u>Santiago-Becerril</u>, there can be no due process violation here. Petitioner's first due process claim is denied.

### B. Voice Identification Procedure

Petitioner asserts that the "identification procedure" in

which Arthur Turner told the police that "Ed" called him and confessed to murdering Penny Anderson was unnecessarily suggestive in violation of due process.  Respondent maintains that there was no legal error relating to the identification, and points out that this Court has already held that there was no police misconduct in connection with the identification procedure.  (Sept. 24, 1999 Mem. and Order at 20, Docket No. 41.)

In <u>Stovall v. Denno</u>, the Supreme Court established that due process can be violated by highly suggestive identification procedures, but stressed that such procedures must be evaluated in light of the totality of circumstances.  388 U.S. 293, 302 (1967).  A pre-trial identification may violate due process when it is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." <u>Simmons v. United States</u>, 390 U.S. 377, 384 (1968).  The critical factor in analyzing the suggestiveness of an identification procedure is the reliability of the identification.  <u>Manson v. Brathwaite</u>, 432 U.S. 98, 114 (1977).  The reliability determination must consider:

> the opportunity of the witness to view the criminal at
> the time of the crime, the witness' degree of
> attention, the accuracy of the witness' prior
> description of the criminal, the level of certainty
> demonstrated by the witness at the confrontation, and
> the length of time between the crime and the
> confrontation.

<u>Neil v. Biggers</u>, 409 U.S. 188, 199-200 (1972).

Within the First Circuit, courts employ a two-pronged

analysis in determining whether a pre-trial identification procedure violates due process.  <u>United States v. DeCologero</u>, 530 F.3d 36, 62 (1st Cir. 2008).  In the first step, the Court asks "whether there was an impermissibly suggestive procedure." <u>United States v. Henderson</u>, 320 F.3d 92, 100 (1st Cir. 2003).  This inquiry "can be broken down into two constituent parts: that concerning the suggestiveness of the identification, and that concerning whether there was some good reason for the failure to resort to less suggestive procedures."  <u>United States v. Holliday</u>, 457 F.3d 121, 125 (1st Cir. 2006) (quoting 2 W. LeFave, <u>Criminal Procedure</u> 668, 2d Ed. (1999)).

If the Court finds an unnecessarily suggestive procedure, it must then decide "whether the identification itself was reliable under the totality of the circumstances, notwithstanding the suggestive procedure."  <u>United States v. Watson</u>, 76 F.3d 4, 6 (1st Cir. 1996)).  This second step incorporates the Supreme Court's multi-factor analysis from <u>Biggers</u>.  <u>See</u> <u>DeCologero</u>, 350 F.3d at 62.  Finally, this Court must bear in mind that "identification evidence . . . should be suppressed as a matter of due process 'only in extraordinary cases.'"  <u>Holliday</u>, 457 F.3d at 125 (quoting <u>Henderson</u>, 320 F.3d at 100).

Under the first prong of the analysis, the Court must decide whether the police questioning of Arthur Turner was "impermissibly suggestive."  The facts indicate that Turner had left Delaware on the evening of Sunday May 14, 1984.  En route to

Massachusetts, he got into a car crash that left his vehicle totaled. After a visit to a hospital in New Jersey, Turner drove a friend's car to Springfield, Massachusetts on the morning of the 14th. That afternoon, he received a call from a person who "identified themself as Ed." (Tr. V:36.) The caller admitted to killing someone and warned Turner that he would soon hear about it in the news. Turner told his sister about the phone call who in turn told their brother. Turner's brother then told the police about the phone call. Two days later, on May 16, the police picked Turner up and drove him to the station to take his statement.

During the course of his voir dire, Turner indicated that he had not read all of the statement that he made to the police before he signed it.

> Q: And is there any reason you didn't read all of it?
> A: Well, sir, the police told me that they knew Ed did the murder.
> Q: They knew what?
> A: They had knew that Edward Wright committed the murder, so at that point I didn't see any reason to go any further with it.

(Tr. V:33-34.) The record does not reflect the exact timing of the police's statement that they knew Ed Wright to be the killer. However, this is not a case where the police told a stranger that a particular individual in a photo array was the perpetrator. Here, before he spoke with the police, Turner had already told his siblings that he received a phone call from a person who – at a minimum – claimed to be "Ed". As this Court previously

observed, "In these circumstances, any taint from a police statement that they knew Wright committed the murder would be minimal." (Sept. 24, 1999 Mem. and Order at 20, Docket No. 41.)

Even if the police made a statement that was impermissibly suggestive, Turner's identification was nonetheless "reliable under the totality of the circumstances." Watson, 76 F.3d at 6. The Biggers inquiry focuses on the witness's familiarity with the defendant, the witness's certainty in his identification, and the duration between the initial encounter and the ultimate identification. Here, it is critical to understand that Turner knew Wright for three or four years and spent time living in the same house as Wright. Although Turner had never spoken with Wright on the phone, he was nonetheless extremely familiar with Wright's voice. Whether Turner spoke to "Ed" for 10 minutes or 36 minutes, either duration is sufficient to make a voice identification. He also stated, "The person that called me identified themself as Ed . . . I only know one Ed, that's Mr. Edward Wright." (Tr. V:36.) Only two days had passed from when Turner received the phone call from "Ed" to his statement to the police.

Petitioner emphasizes that Turner had been in an automobile accident and had scant sleep in the hours before he received the phone call from "Ed." While those facts are undisputed, they do not mean that Turner would have difficulty evaluating the voice of a man he had known for more than three years and with whom he

had lived.  Petitioner also relies on Turner's testimony during the voir dire that he initially did not want to tell the police about the phone call because "as far as I'm concerned, I'm not sure and I'm not going down there and tell a lie."  (Tr. V:35.) Turner also said, "I can't say without the benefit of a doubt that it was Edward, I talked to him on the phone."  (Tr. V:36.) Turner's semi-recantation of his certainty as to the identification of Wright does not transform his initial statement to the police into a due process violation.  His written statement to the police was more appropriately attacked – and was in fact attacked – on cross-examination.  As the First Circuit has observed, "[E]vidence with some element of untrustworthiness is customary grist for the jury mill.  Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." Henderson, 320 F.3d at 101 (quoting Manson, 432 U.S. at 116).

Based on the totality of circumstances, Turner's identification of the caller is not so unreliable as to warrant a violation of Petitioner's due process rights.

### C.  **Admission of Turner's Grand Jury Testimony**

Petitioner argues that the admission of Turner's grand jury testimony violated state law and was so arbitrary and capricious as to constitute a violation of due process.  Underlying Petitioner's claim is the argument that the trial court

misapplied the common law rule of evidence limiting the use of prior inconsistent statements announced in Commonwealth v. Daye, 393 Mass. 55, 75, 469 N.E.2d 483, 496 (1984), overruled on other grounds, Commonwealth v. Le, 444 Mass. 413, 828 N.E.2d 501 (2005).

It is a fundamental principle of the law of federal habeas corpus that a petitioner must allege violations of the Constitution, laws, or treaties of the United States. 28 U.S.C. §§ 2254(a), 2241(c)(3). As the Supreme Court has stated numerous times, "federal habeas corpus relief does not lie for errors of state law." Estelle v. McGuire, 502 U.S. 62, 67 (1991) (quoting Lewis v. Jeffers, 497 U.S. 764, 780 (1990)). Nevertheless, "a state court ruling about state law, on evidentiary or other grounds, may transgress the Constitution." Kater v. Maloney, 459 F.3d 56, 61 (1st Cir. 2006). Petitioner frames his argument about state law in terms of the federal Constitution; this Court must therefore evaluate whether the "state court's finding was so arbitrary and capricious as to constitute an independent due process . . . violation." Lewis, 497 U.S. at 780.

Under Daye, a prior inconsistent statement will be admissible for its probative value if four criteria are met. The statement must be:

> [1] made under oath before a grand jury, [2] provided the witness can be effectively cross-examined as to the accuracy of the statement, [3] the statement was not coerced and was more than a mere confirmation or denial of an allegation by the interrogator, and [4] other

evidence tending to prove the issue is presented. Daye, 469 N.E.2d at 495-96. Petitioner acknowledges that Turner's prior testimony satisfies the first factor of the Daye test, but asserts that none of the remaining three factors was met.

To support his argument that Turner could not be effectively cross-examined as to the accuracy of his testimony before the grand jury, Petitioner argues that "threats of perjury rendered Turner unable to be effectively cross-examined." (Pet'r's Mem. 29.) This argument is baseless. As noted above, there is no reason to believe that Turner heard the prosecutor state at a bench conference, "We are going to pursue a perjury charge." (Tr. V:45.) Nor can the trial judge's advice to secure and consult with counsel prior to testifying be said to have impaired defense counsel's ability to effectively cross-examine Turner. In fact, Turner was adequately cross-examined as to the accuracy of his statement before the grand jury. Defense counsel got Turner to admit that he "had doubts" about the veracity of his identification, and that he "can't say" that Ed Wright was the caller. (Tr. V:176, 178.)

Under the fourth prong of the Daye test, the trial court must find that "other evidence tending to prove the issue is presented." Daye, 469 N.E.2d at 496. Petitioner frames this inquiry as whether there was any evidence beyond Turner's grand jury testimony to support the conclusion that Petitioner was the

-19-

person who called Turner.  The Commonwealth frames the question
as whether there was "corroborative evidence of the
identification that bears on the issue of whether the defendant
on trial was the one who committed the charged offense."
(Resp't's Mem. 29.)  The government's reading makes more sense,
but here, the distinction turns out to be irrelevant.

The Commonwealth offered telephone records that could
support the conclusion that Petitioner called Turner from
Delaware.  As explained above, a phone call was made from the
Delaware house in which Wright was staying to Turner's telephone
number on the same date that Turner allegedly received a call
from an "Ed" confessing to a murder.  At one point, Turner agreed
with the prosecutor that the thirty-six minute phone call from
Delaware was the call he received from "Ed."  (Tr. V:155.)  There
was also additional evidence supporting the conclusion that
Petitioner committed the crime: he was the last person seen with
the victim, a bloody footprint found in the victim's apartment
was similar to the pattern of his sneakers, and there was
evidence of occult blood found in the car Petitioner was driving
on the night of the murder.  Regardless of how the fourth
Daye prong is construed, that prong would not provide an
impediment to the introduction of Turner's grand jury testimony.

Finally, Petitioner asserts that Turner's testimony before
the grand jury should not have been admitted under Daye because
it was no more than a "mere confirmation or denial of an

allegation by the interrogator." <u>Daye</u>, 469 N.E.2d at 496. Under

<u>Daye</u>,

> a grand jury statement should be admitted in evidence
> only if it is clear that the statement was that of the
> witness, rather than the interrogator. Thus, a judge
> should exercise discretion in admitting a witness's
> "yes" or "no" answer to a leading, fact-filled question
> posed at the grand jury proceeding as probative
> evidence regarding the facts alluded to in the
> question.

<u>Id.</u> at 495. That is, to qualify under this prong, the "statement

must be that of the witness and not of the interrogator."

<u>Commonwealth v. Clements</u>, 436 Mass. 190, 192, 763 N.E.2d 55, 57

(2002). Here, Turner's grand jury testimony verified the truth

of prior words to the police. After some preliminary questions,

the prosecutor before the grand jury asked Turner whether he

recognized the statement he had made to the police. (Resp't's R.

App. Vol. II, CA-60.)

After Turner acknowledged his signature at the bottom of the

statement, the prosecutor stated, "I'm going to read this to the

members of the Grand jury at this time, and if there is anything

you wish to change, add, correct or delete, either stop me while

I am reading or tell me at the end." (<u>Id.</u> CA-60-61.) The

prosecutor then read Turner's page-long statement to the police.

After that, Turner's grand jury testimony ended with the

following colloquy:

> Q:  Is that the end of your statement?
> A:  Yes.
> Q:  Is everything in there the truth?
> A:  Yes.

Q:  Is there anything that you wish to change, add,
            correct or delete?
        A:  No.

(<u>Id.</u> CA-63.)

        The trial court's decision to admit Turner's grand jury

testimony for its probative value was made following Turner's

voir dire.  The trial judge stated,

>       On the motion to permit him to testify, I think under
>       the authority of <u>Commonwealth v. Daye</u>, concerning the
>       fact that he is going to be testifying in this trial,
>       the defense counsel will have the opportunity to
>       therefore cross examine him fully on all issues,
>       including the original statement, the grand jury
>       testimony, his present testimony and also considering
>       the fact that the statement being offered for its
>       probative value is grand jury testimony which is
>       recorded and under oath, and considering my opportunity
>       to see him, to consider his testimony and to make
>       judgments about his demeanor, I am satisfied that the
>       earlier testimony, that is, the grand jury testimony
>       which basically incorporates his testimony, has all the
>       indicia of being trustworthy.  [ . . . . ]  I would
>       permit the offering of the grand jury testimony as
>       being permitted for its probative value.

(Tr. V:55-56.).  Although the trial court did not specifically

mention the third <u>Daye</u> factor on the record, that omission is not

sufficient to transform his decision into a due process

violation.

        Petitioner argues that the grand jury testimony at issue is

of the type that "a judge should exercise discretion in

admitting," as no more than a "mere confirmation . . . of an

allegation by the interrogator."  <u>Daye</u>, 469 N.E.2d at 495, 496.

Because of the alleged failure of the government to satisfy the

third factor of the <u>Daye</u> test, Petitioner contends the admission

of Turner's grand jury testimony was in error.  Unfortunately,
there is little caselaw construing this factor, but it is
unlikely that a reaffirmation of the truth of a voluntary
statement made by a witness to the police runs afoul of Daye.

Even if the trial court erroneously applied the Daye
standard, that error was not so arbitrary and capricious as to
rise to a due process violation.

### D.  Mistaken Identification Instruction

Petitioner asserts that the trial court's failure to give
the jury a mistaken identification instruction sua sponte denied
him the due process of law.  Once again, the Commonwealth
correctly points out that Petitioner's claim is founded in state
law.  Niziolek v. Ashe, 694 F.2d 282, 290 (1st Cir. 1982)
("Instructions in a state trial are a matter of state law to
which substantial deference is owed.").

When a petitioner challenges a state court's jury
instruction in the context of a federal collateral attack, the
question is "whether the ailing instruction by itself so infected
the entire trial that the resulting conviction violates due
process, not merely whether the instruction is undesirable,
erroneous, or even universally condemned."  Henderson v. Kibbe,
431 U.S. 145, 154 (1977) (internal citation and punctuation
omitted).  Any error in the trial court's jury instructions must
have a "sufficiently devastating impact on the trial to amount to

a denial of due process." <u>Grace v. Butterworth</u>, 635 F.2d 1, 6
(1st Cir. 1980). "It is well established that the instruction
may not be judged in artificial isolation, but must be considered
in the context of the instructions as a whole and the trial
record." <u>Estelle</u>, 502 U.S. at 72.

When the challenge to jury instructions is not that they are
erroneous, but rather that they are incomplete, it is even harder
to prevail on a due process claim. <u>Henderson</u>, 431 U.S. at 155
("[T]he respondent's burden is especially heavy because no
erroneous instruction was given . . . . An omission, or an
incomplete instruction, is less likely to be prejudicial than a
misstatement of the law."). Moreover, defense counsel did not
object to the lack of a mistaken identification instruction on
the record. (Tr. VII:129-131 (objections to jury instruction).)
"It is the rare case in which an improper instruction will
justify reversal of a criminal conviction when no objection has
been made in the trial court." <u>Henderson</u>, 431 U.S. at 154.

To support his argument, Petitioner points to state and
federal cases in which courts have ruled that the absence of a
mistaken identification instruction may be reversible error.
<u>E.g.</u>, <u>Commonwealth v. Rodriguez</u>, 278 Mass. 290, 391 N.E.2d 889
(Mass. 1979) (a "defendant who fairly raises the issue of
mistaken identification might well be entitled to instructions"
highlighting that issue for the jury); <u>United States v. Greene</u>,
591 F.2d 471, 476-477 (8th Cir. 1979) (reversing conviction based

-24-

on failure to give mistaken identification instruction).  These cases do not, however, indicate that the failure to give a mistaken identification instruction necessarily constitutes a due process violation.

When the model mistaken identification instruction set forth in Commonwealth v. Rodriquez is juxtaposed with the trial court's instruction in Petitioner's case, it cannot be said that the failure to give a mistaken identity instruction resulted in a violation of due process.  See 391 N.E.2d at 897-898.  Petitioner asserts that "[t]here was no language designed to focus the jury's attention on the particular, and crucial, difficulty of assessing Turner's ability to identify the voice of the caller." (Pet'r's Mem. 34.)  This statement may be literally true, but the trial court nevertheless emphasized that the jury would have to determine whether any admissions Petitioner may have made "were in fact made by the Defendant."  (Tr. VII:107.)

Referring to "portions of the evidence where it is alleged that the Defendant told one or two or three witnesses some things such as he did some things to the victim," the trial court instructed as follows:

> . . . I want to be certain that you understand that I
> don't infer that these statements were in fact made by
> the Defendant, because that's not my province, that is
> for you to determine and for you to determine without
> interference by anyone including me.  So I am
> mentioning this simply to illuminate the legal
> principle involved and not to suggest to you that it
> was or wasn't made, because that's for you to say. [ .
> . . .] But whether or not there has been any admission

> is a question of fact to be found by the Jury.  It is
> for you to determine whether or not in fact those
> admissions were made.

(Tr. VII:107-108.).  This instruction told the jury that they must determine whether Petitioner had in fact made an admission to Turner, which is just another way of flagging the question of Turner's identification.

Since this jury was not improperly instructed, it is not fair to call it "highly likely that a properly instructed jury . . . would have reached a different result," as Petitioner asserts.  (Pet'r's Mem. 34.)  As the Supreme Court said in Henderson v. Kibbe, "Even if we were to make the unlikely assumption that the jury might have reached a different verdict pursuant to an additional instruction, that possibility is too speculative to justify the conclusion that constitutional error was committed."  431 U.S. at 157.  Petitioner's due process claim relating to the mistaken identification instruction is denied.

### 3.  Ineffective Assistance of Counsel

#### A.  Standard of Review

To prevail on an ineffective assistance of counsel claim, Petitioner must demonstrate (1) that his counsel's performance was deficient, and (2) that the deficient performance was prejudicial.  See Strickland v. Washington, 466 U.S. 668, 687 (1984).  To prove deficient performance, Petitioner must show that trial counsel failed to provide "reasonably effective

assistance" and thus "fell below an objective standard of reasonableness." Id. at 687-688. This is a weighty burden: this Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. at 689 (internal quotation and citation omitted). Finally, this Court must consider counsel's decisions in light of the facts available when they were made, ignoring the clarity of hindsight. Id. at 690; United States v. Natanel, 938 F.2d 302, 309 (1st Cir. 1991).

In addition to proving that his trial counsel's performance was deficient, Petitioner must demonstrate prejudice as a result of any deficiency. He must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. In this case, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695. Finally, "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." Id. at 696.

## B. Failure to Move to Suppress Voice Identification

Petitioner alleges that trial counsel was ineffective for failing to move to suppress Turner's identification of Petitioner as the person who called him and admitted that he had killed Penny Anderson.  Such a motion was required, Petitioner now claims, based on the fact that the police told Turner that Edward Wright had committed the murder, and in light of the "threats of perjury directed against Turner."  (Pet'r's Mem. 36.)  As noted above, however, this Court has previously found that "any taint from a police statement that they knew Wright committed the murder would be minimal."  (Sept. 24, 1999 Mem. and Order at 20, Docket No. 41.)

This Court simply cannot say that Petitioner's counsel "was not functioning as the 'counsel' guaranteed by the Sixth Amendment."  Strickland, 466 U.S. at 687.  It is not error to fail to file a motion doomed to fail.  See, e.g., Breese v. Commonwealth, 415 Mass. 249, 256, 612 N.E.2d 1170, 1174 (1993) ("counsel was not ineffective for choosing to forgo a meritless argument").  Nor was it unreasonable to adopt a tactic of attacking the identification through cross-examination, as Petitioner's counsel did.  See Commonwealth v. Schlieff, 369 N.E.2d 723, 726 (Mass. App. Ct. 1977).

## C. Failure to Explicitly Object Under Daye

Petitioner next asserts that trial counsel was ineffective

for failing to specifically address the factors set out in Commonwealth v. Daye as predicates for the admission of Turner's grand jury testimony.  Essentially, Petitioner hypothesizes that if trial counsel had made a sharper argument against the admission of Turner's grand jury testimony, the judge may have declined to admit it for its probative value, and the jury may have had a reasonable doubt.

At every opportunity, Petitioner's counsel argued against the admission of Arthur Turner's grand jury testimony.  Before trial, the Commonwealth filed a motion in limine describing how Turner's grand jury testimony satisfied the Daye criteria. (Resp't's R. App. Vol. II, CA-10-16.)  Petitioner's counsel responded by insisting that the admission of Turner's grand jury testimony would contravene the Massachusetts Constitution and that the trial judge should conduct a voir dire under Daye. (Resp't's R. App. Vol. II, CA-52-56.)  The trial court ultimately conducted a voir dire, during which Petitioner's counsel cross-examined Turner.  (Tr. V:23-25, 29-32.)  Following the court's decision to admit Turner's testimony for its probative value, Petitioner's counsel promptly objected.  (Tr. V:56.)

Despite all of these efforts, Petitioner argues that defense counsel was deficient for never making any effort to "specifically address the factors set out in" Daye.  (Pet'r's Mem. 37.)  Indeed, the record fails to disclose any occasion on which defense counsel argued against the admissibility of

Turner's grand jury testimony on the basis of its failure to meet the third prong of the test set out in the Daye opinion, which was at least an arguable issue.

Yet even if counsel was deficient for failing to argue under the precise Daye factors, that error cannot be said to have prejudiced the Petitioner.  In its motion in limine, the Commonwealth described each factor of the Daye test for the court, and applied the facts of Turner's grand jury testimony to each.  (Resp't's R. App. Vol. II, CA-12-15.)  The Court was therefore on notice of the Daye test, and properly identified the Daye opinion as controlling the admissibility of Turner's grand jury testimony for its probative value.  (Tr. V:54.)  The Court clearly considered Daye and ruled accordingly.  (Id.)  There is simply no "reasonable probability" that a more targeted argument by defense counsel would have tipped the scales in Petitioner's favor, and therefore no "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.

### D.  Failure to Seek Mistaken Identification Instruction

Petitioner also asserts that counsel was ineffective for failing to request a mistaken identification instruction. Respondent maintains that no such instruction was warranted on the facts.  As explained above, this case did not present the typical concerns involving stranger identifications by a victim

or witness made through lineups, showups, and photo arrays. Since Turner had known Petitioner for more than three years at the time of the identification, and since the two had lived in the same house during part of that time, a mistaken identification instruction was not required.  Cf. Commonwealth v. Pressley, 390 Mass. 617, 619, 457 N.E.2d 1119, 1120 (1983) ("There may be cases in which the parties are so well known to each other or so closely related that under sufficient lighting and with appropriate physical proximity, the identification by the victim is either true or the victim is lying.").  Yet even if defense counsel erred by failing to request a mistaken identification instruction, that alleged error did not prejudice Petitioner.  As explained above, the trial court's instruction emphasized that the jury was responsible for determining whether Petitioner actually confessed to Turner over the phone.

### ORDER

Petitioner's petition for a writ of habeas corpus is **DENIED**.


**S/PATTI B. SARIS**
United States District Judge